## 36185. AUTRY *v.* THE STATE.

GARDNER, P. J. Burney Autry was convicted in the Superior Court of Morgan County on an indictment charging (omitting the formal parts) that he did "knowingly permit and allow certain persons, to wit, Herbert Burt, Hayne Burt, and Sid Thompson to have and possess and locate on the premises of the said Burney Autry . . . certain apparatus, namely, a complete distilling apparatus, including still, head, containers for beer, small utensils, for the manufacturing and distilling of alcoholic, spirituous, vinous, malted, fermented and mixed liquors and other intoxicating liquors and beverages, a part of which is alcoholic. . ."

The evidence introduced by the State was furnished by Sheriff George P. Saye of Morgan County. He testified: "I am sheriff of Morgan County and served in that capacity on November 11, 1954. I know Burney Autry who lives in this county. His home is near Hobart in the upper end of the county of Morgan. We raided a liquor still on his place on November 11, 1954. We caught two Burke fellows and one negro, Sid Thompson. This still was located on Burney Autry's property. That was a complete distillery, in operation at the time we saw it. It made alcoholic beverages. It was on the home place of Mr. Autry's. The traffic on the place came in his driveway and around his house and turned and went by the chicken house. It went through his land, as close as from me to you to the yard. I came out that way after we raided the still. I went around to see whether there were other means of going to the still site. There had been no traffic on any other passage. Mr. Autry has a tractor at his place; he said it was his. It was broken down, it seems like he said three days before then. There had been a rain and after the rain it was muddy. There was a complete liquor outfit, composed of a head and about 250 gallon outfit. Mr. Herbert Burke and Hand Burke and Sid Thomas were operating it."

On cross-examination he testified: "I testified in the conspiracy case in the federal court. I know Mr. Autry was working at Eatonton; I don't know

whether he was working there then. I have seen him at the grill. I have heard he was going to work at night. I saw him in his car, I don't know where he was going. He stopped at the grill and said he was going there. I will say he worked at Eatonton. I haven't got anything against Burney. I don't know who was at the head of that distillery. I was with them when they raided the still. Mr. Autry told me he had been down there. I did not see him there. He told me he drove a tractor down there before it was raided. The tractor went down there before we raided the still. I know because I saw the track; it was right after a rain and the tractor made prints where it was parked. He told me something about he went down there and told them to move it out. He did not say he intended to come up here and tell me about it. I don't know whether any of these parties live around here; I had never seen them until we caught them at the distillery. I found out they were not residents of this county. I was with them when they made the raid. It was a big distillery. We destroyed it. The distillery was not on the river but on a branch that leads into the river. There is a road that came up there but there are weeds and vines between there and the river. I don't know how far it was from the river; I don't think it is too far. I did not help the sheriff in Oconee when he raided them."

The same witness testified on re-examination: "Mr. Autry was living in that home place at that time and living there now. That is the man I referred to as driving through near the yard. I circled the still to ascertain whether or not the traffic came in any other direction. I did not promise him anything for any statement he made to me, or threaten him. He said he went on a tractor to the still. I would think that was some two or three days before the raid. It was right after a rain and it was muddy and the tractor skidded around and made big prints. The liquor made at that distillery was alcoholic, what is known as white shine liquor."

On recross he testified: "There was just one road. Referring to picture shown me, I can't identify his farm. That is not the road that goes down to the river. This picture does not show the chicken house or barn in his yard and I don't think this is a picture of his house. Referring to second picture shown me, this does not show his house; I don't believe anybody could identify that picture. There are no woods near his house as in this picture; his house sits out in the field; I don't think he has any trees around his house. I can't identify a thing in either of those three pictures. He has a big chicken barn back of his house. That is not the back of the chicken house right beyond the trees; that is a limb right there. His chicken house is beyond his house, going toward the river; it would be right here (pointing out on picture). That does not look like his house but would be a quarter of a mile from his house. Down near the distillery there is a sawmill road where there was a big sawdust pile on the hill above the still and from there on down had been in woods. There was not any road from the dairy barn. There is a fence from his house on the side near the highway but no road."

Upon being recalled, the sheriff testified further: "I had looked for this still off and on for a month. It was reported to me and we tried to find it,

some federal men and state men. We gave up the idea and my inform-
ant came back to me again. We examined the sawmill road. There was
no travel by any vehicle. The still was on Mr. Autry's land in Morgan
County. The liquor that was being produced was intoxicating." And
on cross-examination testified: "Burney told me he had been down to
the still on a tractor. I was not asked that question before."

The defendant introduced no evidence but made the following statement
in his own behalf: "When this still was raided, I believe on November
11th, I had been working at Eatonton some six months before it was
raided. I didn't know anything about this still until I came home Thurs-
day morning and my wife had heard it over the radio about them raid-
ing a still on my farm. I said, 'I am going to get on the tractor and
see if I can find it.' I got on the tractor and went through this road
shown in the picture. About 250 feet below my mail box the road leads
into my farm. The road had been there for years. I went that road
and found the still. That was on Thursday morning and that afternoon
Mr. George Saye and others came out with the county trucks to move
it away. I had worked at night and I was in bed. They woke me up
when they went to get it. That was Thursday and I came down next
day to the courthouse and asked Mr. Saye about whose still it was and
who they got and what size still. He said, 'Autry, I believe you knew
about that still. I am going to have to place you under a $500 bond.'
I said, 'You know me better than that. If I knew anything about it I
would tell you about it. I didn't have anything to do with it.' He said,
'I will have to place you under bond anyway.' That was on Friday and
I came down Tuesday of next week and gave bond on it. I knew
nothing about this still, never saw a liquor still before in my life and
I got on my tractor, my wife told me they had raided one, and rode to
this place about a half to three-quarters of a mile from my house, down
on the swamp. I had nothing to do with it and didn't know it was
there. There was a sawmill road a year or so before the still was put
there. The road led into the back of the farm. There were roads all over
the place; there were half a dozen different ways you could go back in
it and there had been a whisky still in there. The year I bought the
place in 1951 the federal officers were in there. I don't know whether
Mr. Saye was in on that raid or not. I bought the place in the fall of
1951 and they raided a still that year almost within 100 yards or 75 yards
of where this one was raided at, and the road was made by the sawmill
people, a good road all the way in; the fact is you could go all the way
down in an automobile. The raided still was below my driveway 250
feet. There was no road leading to it; the only way they could have
gone would be through a cultivated field. I left home every night at
nine o'clock and got back at eight and if anybody went through there
I would have known it. If I had known anything about it I would have
turned it up myself. I did not know anything about it until I came in
Thursday morning. My wife had heard it on the radio and I got on the
tractor and rode down there and back in my tractor, after it was raided."

The jury returned a verdict of guilty. The defendant filed a motion for
new trial on the general grounds only. This motion was denied. The
defendant excepted to this judgment and assigns error here. Code

4

§ 58-209; *Fields* v. *State,* 58 *Ga. App.* 397 (198 S. E. 718); *McElwaney* v. *State,* 66 *Ga. App.* 112 (17 S. E. 2d 202); *Nalley* v. *State,* 71 *Ga. App.* 742 (32 S. E. 2d 204); and *Sims* v. *State,* 84 *Ga. App.* 753 (67 S. E. 2d 254), affirming the judgment denying the motion for a new trial.

*Judgment affirmed. Townsend and Carlisle, JJ., concur.*

DECIDED MAY 17, 1956.

*Orrin Roberts,* for plaintiff in error.
*George D. Lawrence, Solicitor-General,* contra.